UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JESSE D. WEST,

                          Plaintiff,

v.                                                                    9:17-CV-0621
                                                                      (GTS/DJS)
JOHN HARKNESS, #0304, Police Officer; and
JOHN HARRIMAN, #0463, Police Officer,

                          Defendants.
_____

APPEARANCES:                                        OF COUNSEL:

OFFICE OF JEFFREY PARRY                       JEFFREY PARRY, ESQ.
  Counsel for Plaintiff
730 East Genesee Street
Fayetteville, NY 13066

OFFICE OF JARROD W. SMITH                   JARROD W. SMITH, ESQ.
  Co-counsel for Plaintiff
11 South Main Street
P.O. Box 173
Jordan, NY 13080

HON. JOSEPH BARRY                               TODD M. LONG, ESQ.
Acting Corporation Counsel                       Assistant Corporation Counsel
City of Syracuse
  Counsel for Defendants
233 East Washington Street
300 City Hall
Syracuse, NY 13202

GLENN T. SUDDABY, Chief United States District Judge

## **DECISION and ORDER**

          Currently before the Court, in this civil rights action filed by Jesse D. West ("Plaintiff")

against City of Syracuse police officers John Harkness and John Harriman ("Defendants"), is

Defendants' second motion for summary judgment.  (Dkt. No. 150.)  For the reasons set forth below, Defendants' motion is granted.

## I.     RELEVANT BACKGROUND

### A.     Relevant Procedural History

Surviving the Court's Decision and Order of September 21, 2021, are Plaintiff's claims against Defendants for unreasonable search and failure to intervene under the Fourth Amendment arising from the events that occurred inside a prisoner transport van on February 24, 2017.  (Dkt. No. 124, at 2, 21-30.)[1]

### B.     Parties' Arguments on Defendants' Second Motion for Summary Judgment

Generally, in their memorandum of law, Defendants argue that Plaintiff's claims for unreasonable search and failure to intervene should be dismissed for three reasons: (1) Defendants acted reasonably in light of the exigent safety risks existing at the time and Plaintiff's failure to comply with commands to submit to a search and stop reaching; (2) portions of Plaintiff's testimony are so inconsistent, contradictory and incomplete that they permit (and indeed require) the Court to render a credibility determination pursuant to *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005); and (3) in any event, Defendants are protected from liability as a matter of law by the doctrine of qualified immunity, because no reasonable police officer would have believed that the conduct alleged was unconstitutional in light of Plaintiff's combative and suggestive behavior, the reported information known to Defendants at the time of

---

[1]     The Court notes that, although Plaintiff sometimes argues in his opposition memorandum of law that he is also asserting a claim of excessive force (*see, e.g.,* Dkt. No. 156, at 5, 8), that claim was converted to one of unreasonable search in the Court's Decision and Order of September 21, 2021, and neither Plaintiff nor Defendants successfully moved for reconsideration of that conversion.  (Dkt. No. 132, at 5-6.)

Plaintiff possessing a gun and menacing people with it, and the cumulative exigent safety risks existing at the time.  (Dkt. No. 150, Attach. 21.)

Generally, in his opposition memorandum of law, Plaintiff argues that Defendants' motion should be denied for three reasons: (1) Defendants' search of Plaintiff was unreasonable as a matter of law, because his hands were cuffed behind his back at the time of the search and thus a simple pat frisk would have sufficed, but instead he was strip searched in a public place; (2) *Jeffreys*' exception (to the prohibition on rendering credibility determinations when deciding a summary judgment motion) does not apply to this case, because Plaintiff's testimony is accompanied by ample supporting evidence, and any inconsistencies in that testimony are explained by his little education and poor vocabulary; and (3) Defendants are not protected from liability as a matter of law by the doctrine of qualified immunity, because the Court already decided this issue on Defendants' first motion for summary judgment, which presented the same facts as does the current motion.  (Dkt. No. 156.)

Generally, in their reply memorandum of law, Defendants assert three arguments: (1) most of Plaintiff's Local Rule 56.1 Response should be rejected because he fails (as he did when responding to Defendants' first motion for summary judgment) to properly respond to Defendants' Local Rule 56.1 Statement of Material Facts; (2) Plaintiff mischaracterizes the search in question as an established form of "strip search" and fails to acknowledge the perceived exigent circumstances existing at the time; (3) Plaintiff's response highlights even more examples of why the *Jeffreys* exception should be applied; and (4) Plaintiff's qualified immunity argument is misguided because the Court previously acknowledged that Defendants would have an opportunity to renew their request as to the claim that it reframed when deciding Defendants'

first motion for summary judgment.  (Dkt. No. 160.)

      **C.**    **Statement of Undisputed Material Facts**

Generally, unless otherwise noted, the following facts have been asserted and supported by Defendants in their Statement of Material Facts and admitted by Plaintiff in his Response thereto (either expressly or due to his failure to support a denial with a citation to admissible record evidence).  (*Compare* Dkt. No. 150, Attach. 20 [Defs.' Rule 56.1 Statement] *with* Dkt. No. 157 [Plf.'s Rule 7.1 Response].)

Events Prior to Plaintiff's Arrest

1.      On February 23, 2017, Syracuse Police Department ("SPD") Officer Cody Nellis responded to 217 Aberdeen Terrace in Syracuse, New York, regarding a verbal domestic incident. Upon arrival, Officer Nellis spoke to S.V., who reported that she has "a full stay away order" against her ex-boyfriend, Plaintiff.

2.      S.V. told Officer Nellis that Plaintiff had been calling her continuously for the previous 24 hours, and she showed Officer Nellis her cell phone, which showed more than 40 unanswered calls from a land-line telephone number assigned to 1313 Grant Boulevard in Syracuse, New York.

3.      S.V. told Officer Nellis that Plaintiff had been physically violent with her in the past (with numerous physical altercations dating back several years) and that she finally had had enough of the abuse, so she had ended the relationship approximately a month before. S.V. also reported that, after she had left Plaintiff, he had started using drugs frequently and becoming increasingly hostile towards her. She described him as "going crazy."

4.      S.V. told Officer Nellis that she had answered one of these phone calls from

4

Plaintiff in an attempt to direct him to stop calling her. She reported that, during the call, Plaintiff had claimed that he had recently came into possession of a handgun from his cousin and that he was going to kill her, their child, and the police when they came for him, because he had "nothing else to live for" and was adamant about "going out with a bang." S.V. said that she believed Plaintiff was "very unstable" and that his threats were sincere.

5.      Thereafter, Officer Nellis obtained a sworn statement from S.V. regarding Plaintiff and her desire for prosecution against him.

6.      Officer Nellis learned from S.V. that Plaintiff had been staying with family members at 1313 Grant Boulevard in Syracuse, New York. Officer Nellis advised her to get in touch with Vera House or other related services with regard to domestic violence. She said she would be unable to leave her parents' residence because she feared for their safety as well.

7.      After speaking with S.V., Officer Nellis prepared a warrant application for Plaintiff's arrest based on evidence that he had violated a protective order. As a part of this process, SPD issued notice to the Onondaga County 9-1-1 Center to flag any potential calls in connection with Plaintiff.

<u>SPD's Response to Report of Suspicious Person with a Weapon</u>

8.      The following day, February 24, 2017, at or around 5:06 PM, Officer Nellis and multiple other SPD units responded to 1313 Grant Boulevard regarding a Suspicious Person With a Weapon call.

9.      The caller, S.V., had reported to 911 that Plaintiff was standing outside 1313 Grant Boulevard with a gun and threatening to shoot everyone. S.V. had also reported that Plaintiff was on "molly" and had threatened to come "mess up her van," and that her friend had

seen Plaintiff display what she believed to be a handgun earlier that day.

10.     Around the time Officer Nellis arrived at 1313 Grant Boulevard, he was joined by SPD Officer Michael Shannon, Sergeant David Hart, and Defendant Harriman. After establishing a perimeter around the residence, the three officers approached the front door and ordered the occupants to exit.

11.     Three individuals exited the residence, including Plaintiff's father (Jesse West Jr.), who gave the officers permission to enter the residence.

12.     Officers Nellis and Shannon entered the residence and began clearing rooms. As Officer Nellis entered the kitchen area, he observed a closed door in the rear of the kitchen. When he attempted to open the door, it appeared to be held shut from the other side.

13.     Officer Nellis called for assistance and was joined by Officer Shannon and Sergeant Hart, all three of whom drew their SPD-issued weapons (due to the nature of the call indicating that a weapon might be involved) and ordered the individual inside to exit with his hands in the air. When Plaintiff came out from the room, he was placed under arrest, handcuffed, and escorted outside.

14.     Outside of the residence, as the officers attempted to place Plaintiff into the back of Defendant Harriman's nearly patrol vehicle, he "bucked" the officers. Plaintiff was, in his own words, "struggling to get free" because he was in pain.

15.     Plaintiff was eventually brought to the ground by officers.

16.     At approximately this time, Defendant Harkness arrived on the scene and observed Plaintiff laying on the pavement in a prone position "thrashing his body from side to side." Defendant Harkness then helped gain control of Plaintiff.

6

17.     By the time Plaintiff was under control, an SPD prisoner transport van had arrived on scene. The prisoner transport van is larger than a patrol car and therefore much easier to place individuals inside.

18.     Defendants Harkness and Harriman escorted Plaintiff to the transport van.

<u>Defendants' Search of Plaintiff</u>

19.     SPD's operations policy titled "Arrest, Processing & Transporting Prisoners" (Art. III, Sec. 9.17) states, in pertinent part, that "[a]ll persons taken into custody will be thoroughly searched for weapons, evidence, means of escape, and/or contraband prior to being transported."

20.     A mere "pat down" or "pat-frisk" search may be unable to detect weapons such as handguns, knives or sharp objects; thus, before transport, a more thorough search may be required, especially where the individual has exhibited violent behavior and/or is suspected of having weapons.

21.     Before the arrival of the prisoner transport van, Plaintiff had not been searched beyond being pat-frisked.

22.     In addition, at the time that Plaintiff's arrival at the transport van, both Defendants Harriman and Harkness were aware of the 911 call of February 24, 2017, about an individual with a weapon. In particular, they had been advised by an SPD dispatcher that Plaintiff had been standing outside with a gun and stating that he was going to shoot everyone–including police–if they showed up. They had also been advised that the 911 caller had complained that Plaintiff had displayed and pointed the gun at a woman who had driven by him.

23.     The prisoner transport van is divided roughly in two sections: the front section

for the driver and front seat passenger, and the rear section for the prisoners. The rear (or prisoner) section is at least ten feet long with two parallel benches running lengthwise. A metal grate wall separates the driver-and-front passenger section from the prisoner section.

24.     While outside the van, near the open doors, Defendant Harriman stated (to one or more other officers) that Plaintiff had not been searched thoroughly and that he would need to be searched again before transport.

25.     Upon seeing Defendants coming into the van for him, Plaintiff stated words to the effect of "That's not going to happen" or "Nobody is going to search me,"[2] and he "slid" to the portion of the prisoner section that is separated from the front section by a metal grate wall.

26.     Plaintiff leaned himself against the metal grate wall, away from approaching Defendants.

27.     As Plaintiff's hands were cuffed behind his back, he tucked his head to his chest

---

[2]      Plaintiff's response that "I can't recall. I don't know. . . . I don't recall that" (Dkt. No. 150, Attach. 2, at 84 [Plf.'s First Depo. Tr.]) is insufficient to dispute the above-stated factual assertion. *See Genger v. Genger*, 663 F. App'x 44, 49 n.4 (2d Cir. 2016) (summary order) (noting that a statement that one "ha[d] no recollection" of a fact "does not constitute a denial"); *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d Cir. 2000) ("[V]ague denials and memory lapses . . . do not create genuine issues of material fact."); *Davis v. City of Syracuse*, 12-CV-0276, 2015 WL 1413362, at *2 (N.D.N.Y. Mar. 27, 2015) (Suddaby, J.) ("On a motion for summary judgment, denials of fact that are based on a lack of personal knowledge . . . are insufficient to create a genuine dispute."); *Faruki v. City of New York*, 10-CV-9614, 2012 WL 1085533, at *5 (S.D.N.Y. Mar. 30, 2012) ("Plaintiff's statement that she does not recall whether Defendants asked her to leave the store does not create a genuine dispute on that material issue.").  In addition, Plaintiff's deposition testimony that such a search is "not the normal procedure" is not sufficient to dispute the above-stated factual assertion (and, indeed, such a belief at the time would explain his resistence to a search).  (Dkt. No. 150, Attach. 2, at 84 [Plf.'s First Depo. Tr.].)

and grabbed onto his jeans.[3]

28.     Defendant Harkness asked Plaintiff what he was reaching for; Plaintiff said that

he had nothing; Defendant Harkness said that he had something; and Plaintiff said again that he

had nothing.[4]

29.     A struggle ensued between Plaintiff and Defendant Harkness.[5]

30.     Upon seeing this struggle, Defendant Harriman climbed into the van to help

Defendant Harkness.

31.     During the physical contact, Defendant Harriman yelled at Plaintiff, "[S]top

reaching!"

32.     Defendant Harkness unfastened Plaintiff's belt and pulled his pants down while

Defendant Harriman searched the interior of Plaintiff's pants and pockets. That search yielded

negative results.

33.     Defendant Harriman then directed his attention to the waistband of Plaintiff's

boxer briefs.

34.     Defendant Harriman ran his right hand along Plaintiff's waistband to confirm

_____

[3]     (Dkt. No. 150, Attach. 16, at ¶ 5 [Harkness Affid.].)  Plaintiff's response, "I don't
understand how I was reaching with my hands cuffed behind my back" does not controvert the
above-stated factual assertion, especially given the proximity of his hands to the rear of his pants
and/or waist band.  (Dkt. No. 150, Attach. 10, at 7 [Plf.'s Second Depo. Tr.].) *See, supra,* cases
cited in note 2 of this Decision and Order.

[4]     (Dkt. No. 150, Attach. 16, at ¶ 5 [Harkness Affid.]; Dkt. No. 150, Attach. 10, at 7
[Plf.'s Second Depo. Tr.].)

[5]     Plaintiff characterizes this struggle as the result of the officers "jump[ing] me,"
while Defendants characterize it as the result of Plaintiff "charging" at Defendant Harkness.
(*Compare* Dkt. No. 150, Attach. 10, at 7 [Plf.'s Second Depo. Tr.] *with* Dkt. No. 150, Attach. 16,
at ¶ 5 [Harkness Affid.] *and* Dkt. No. 150, Attach. 17, at ¶ 10 [Harriman Affid.].)

whether he was concealing anything inside his boxer briefs.[6]  This search yielded negative results.

35.     The parties dispute whether, either before or after doing so, Defendant Harriman also ran a bare hand between Plaintiff's buttocks and over his anus (although Plaintiff admits Defendants' factual assertion that at no time did Defendants or any officer "penetrate" Plaintiff's anus).

36.     At the time of the search, Plaintiff was turned facing the wall, away from Defendants.

37.     Based on Plaintiff's position during this search, and the fact that Defendants were standing between Plaintiff and the doors, it would have been extremely difficult for any bystander on the street to see him with his pants down.

38.     Plaintiff has identified no witnesses (other than Defendants) to the search.

39.     As Defendant Harriman started to follow Defendant Harkness out of the van, Plaintiff lunged at him and attempted to headbutt him.[7]  In response, Defendant Harriman pushed his right forearm towards Plaintiff to deflect the blow.

40.     Defendant Harriman then removed his pepper spray, pointed it at Plaintiff, and

_____

[6]      (Dkt. No. 150, Attach. 17, at ¶ 14 [Harriman Affid.].)  Plaintiff's assertion that Defendant Harriman "credit card swipe[d] me" does not controvert the above-stated asserted fact. (Dkt. No. 150, Attach. 2, at 70 [Plf.'s First Depo. Tr.].)

[7]      (Dkt. No. 150, Attach. 17, at ¶ 47 [Harriman Affid.].)  Plaintiff's denial of the headbutting attempt without a supporting record citation is ineffective.  (Dkt. No. 157, at ¶ 47 [Plf.'s Rule 7.1 Response].)  In addition, his response that he was never asked to deny this question in his Rule 50H Hearing does not constitute a citation to admissible record evidence controverting the above-stated factual assertion.  (*Id.*)  The Court notes that Plaintiff does not cite to an affidavit denying the headbutting attempt.

informed him that he would be sprayed if he did not sit down.[8] Plaintiff obeyed this command and Defendant Harriman exited the van.

41.     Plaintiff was then transported by van to the Onondaga County Justice Center.

42.     Plaintiff was charged with Resisting Arrest and Harassment in the Second Degree with regard to his conduct on February 24, 2017. He was also charged with Aggravated Harassment in the Second Degree and Criminal Contempt in the First Degree with regard to his conduct on February 23, 2017.

43.     Under two addition case numbers, Plaintiff was further charged with Aggravated Harassment in the First Degree, Criminal Contempt in the First Degree, and Criminal Contempt in the Second Degree with regard to conduct involving S.V.

44.     In his Rule 33 responses in this action, Plaintiff responded (through counsel) that he had been "rape[d]" by Defendant Harriman. In his second deposition, Plaintiff withdrew that response.

## II.     GOVERNING LEGAL STANDARD

### A.     Procedural Legal Standard

Because this Decision and Order is intended primarily for the review of the parties, the Court will incorporate by reference the procedural legal standard set forth in Part II of its Decision and Order of September 21, 2021.  (Dkt. No. 18, at 18-21.)

---

[8]     (Dkt. No. 150, Attach. 17, at ¶ 48 [Harriman Affid.].)  Plaintiff's denial of the above-stated factual assertion without a supporting record citation is ineffective.  (Dkt. No. 157, at ¶ 48 [Plf.'s Rule 7.1 Response].)  In addition, his response that he was never asked about being threatened with pepper spray in his Rule 50H Hearing does not constitute a citation to admissible record evidence controverting the above-stated factual assertion.  (*Id.*)  The Court notes that Plaintiff does not cite to an affidavit denying the assertion.

B.      **Substantive Legal Standard**

Generally, the elements of a claim for an unreasonable search are the following: (1) the

defendant willfully conducted a search of the plaintiff; and (2) the search was objectively

unreasonable under the circumstances. In deciding whether the second element has been

satisfied, a fact finder must consider the following: (a) the scope of the particular intrusion; (b)

the manner in which it is conducted; (c) the justification for initiating it; and (d) the place in

which it is conducted. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

Generally, "[t]o establish such a claim of failure to intervene, a plaintiff must prove the

following four elements: (1) that a constitutional violation was being committed against the

plaintiff; (2) that the officer knew, or deliberately ignored, the fact that the constitutional

violation was going to be, or was being, committed; (3) that the defendant had a reasonable

opportunity to intervene and prevent the harm; and (4) that the defendant did not take reasonable

steps to intervene." *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 296 (N.D.N.Y. 2018) (citing

*Curley v. Vill. of Suffern*, 268 F.3d 65, 72 [2d Cir. 2001]; *Anderson v. Branen*, 17 F.3d 552, 557

[2d Cir. 1994].)

III.    **ANALYSIS**

A.      **Defendants' First and Third Arguments**

The Court begins its analysis by addressing Defendants' first and third arguments, which

are summarized above in Part I.B. of this Decision and Order: (1) that they are entitled to

judgment as a matter of law on Plaintiff's claims, because, based on the admissible record

evidence, it is undisputed that Defendants acted reasonably in light of the exigent safety risks

facing them at the time and Plaintiff's failure to comply with their commands to submit to a

12

search and stop reaching, and (2) that, in any event, they are entitled to judgment as a matter of law on Plaintiff's claims, because no reasonable police officer would have believed that the conduct alleged was unconstitutional in light of Plaintiff's combative and suggestive behavior, the reported information known to Officers at the time of Plaintiff possessing a gun and menacing people with it, and the cumulative exigent safety risks (thus entitling Defendants to qualified immunity).

After carefully considering the matter, the Court must reject both arguments because neither one could succeed if a reasonable jury were to credit Plaintiff's testimony that, during the search of Plaintiff's boxer briefs, Defendant Harriman made "contact with" Plaintiff's anus (albeit without "penetration [of]" it)[9] "barehanded[ly],"[10] for between 20 and 40 seconds.[11]  More

---

[9]      (Dkt. No. 117, Attach. 2, at 21-22, 50, 55-56, 70 [Plf.'s First Depo. Tr., testifying that one of the defendants ran his "hand down the crack of my ass . . . touch[ing] . . . my rectum . . . on the outside [of it] . . . touching my anal [sic]" . . . [running] his hand down my cheeks and touch[ing] my anal [sic] . . .")]; Dkt. No. 122, Attach. 3, at 62, 65-66 [Plf.'s 50-h Hearing, testifying that the "swipe" involved "touching my rectum" or "rectal area"].)

[10]      (Dkt. No. 8, at 4, 6, 7, 9 [Plf.'s Verified Am. Compl., swearing that the touching was done "barehanded"]; Dkt. No. 122, Attach. 3, at 62, 66 [Plf.'s 50-h Hearing, testifying that the "swipe" was done with "bare hands" or "bare handed"]; Dkt. No. 117, Attach. 2, at 50, 56 [Plf.'s First Depo. Tr., testifying that one of the defendants ran his "bare hand down the inside of my buttocks, my butt cheeks, touching my rectum . . . with his bare hands"].)  The Court notes that a Verified Complaint has the force and effect of an affidavit or declaration for purposes of a motion for summary judgment. *See, e.g., Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d. Cir. 2004) ("[A] verified pleading . . . has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied*, 536 U.S. 922 (2002); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.").

[11]      (Dkt. No. 122, Attach. 3, at 62, 65-66 [Plf.'s 50-h Hearing, testifying that the "swipe" involved "touching my rectum" or "rectal area," and was done "slowly," taking "20 seconds"]; Dkt. No. 150, Attach. 10, at 14-15 [Plf.'s Second Depo. Tr., testifying that the

specifically, the Court has trouble finding that exigent safety risks and Plaintiff's failure to comply with commands could and do justify, as a matter of law, such a barehanded, slow contact with his anus, as well as the idea that reasonable police officers could have believed such contact was constitutional (especially where, as here, they claim that no such contact occurred).

### B.    Defendants' Second Argument

Apparently anticipating this trouble, Defendants' second argument essentially asks the Court to disregard the above-described testimony under *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005). Generally, of course, credibility issues, which are questions of fact for resolution by a jury, may not be decided by a court on motion for summary judgment. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The Second Circuit, however, has recognized a very limited exception to this general rule in *Jeffreys*, 426 F.3d 549. In that case, the Second Circuit held that summary judgment may be awarded in the rare circumstance where there is nothing in the record to support the plaintiff's allegations of the defendants' constitutional violations, aside from his own contradictory and incomplete testimony, and, even after drawing all inferences in the light most favorable to the plaintiff, the court determines that "no reasonable person" could credit the his testimony. *Id*. at 554-55.

To apply the *Jeffreys* exception, the following three requirements must be met: (1) "the plaintiff must rely 'almost exclusively on his own testimony,'" (2) the plaintiff's "testimony must be 'contradictory or incomplete,'" and (3) the plaintiff's testimony must be contradicted by evidence produced by the defense. *Benitez v. Ham*, 04-CV-1159, 2009 WL 3486379, at *20-21 (N.D.N.Y. Oct. 21, 2009) (Mordue, J., adopting Report-Recommendation on clear-error review)

_____

defendant's physical contact with his anus lasted "about, like, 30 seconds, 40 seconds"].)

(quoting *Jeffreys*, 426 F.3d at 554).

Here, Defendants specifically argue as follows: (1) Plaintiff relies exclusively on his own testimony, which is uncorroborated by any other evidence; (2) his testimony is incomplete in that he still does not know (a) which Defendant made contact with his anus, and which Defendant failed to intervene in that contact, (b) whether he expressed a verbal objection to the officers searching him, and (c) whether the officers said anything to him in the rear of the van immediately before and during the search; and (3) even if Plaintiff's testimony is complete, his testimony is internally contradictory in that (a) it inexplicably states he could not have reached toward the waistband of his pants because his hands were cuffed there, (b) it states both that there was a digital penetration of his anus and that there was no such penetration, and (c) it states that the contact lasted "slowly," for 30-40 seconds, for 20 seconds, for "a few seconds," and for an unknown length of time.

### 1.    Whether Plaintiff Is Relying Almost Exclusively on His Own Testimony

With regard to whether Plaintiff is relying "almost exclusively on his own testimony" (in attempting to prove that one of the Defendants made contact with his anus during their search of him inside the prisoner transport van on February 24, 2017), the Court finds that he is doing so. Granted, in addition to his own testimony, Plaintiff relies on the testimony of his aunt that, after the search, he had told her that one of the officers had stuck some sort of object "in his butt." (Dkt. No. 150, Attach. 11, at 7-8 [Depo. Tr. of Nedra Pettiford].) In addition, Plaintiff is free to rely on the testimony of Custody Department Sergeant Jeffrey Wick that a "rape kit" examination was performed at a hospital as a result of one or more unidentified statements made by him at, or

15

on the way to, the Onondaga County Justice Center. (Dkt. No. 150, Attach. 19, at ¶¶ 5-8 [Affid. of Jeffrey Wick]; *accord*, Dkt. No. 150, Attach. 2, at 38-43, 97-98, 104 [Plf.'s First Depo. Tr.]; Dkt. No. 8, at 8, 9 [Plf.'s Verified Am. Compl.].)

However, Ms. Pettiford's testimony appears to be inadmissible hearsay, a fact that Plaintiff at one point expressly concedes. (Dkt. No. 157, at 25-27 [Plf.'s Response to Question of Fact No. 73].)[12] Moreover, the evidence regarding a "rape kit" examination appears conspicuously devoid of (1) testimony that the results of the examination were positive, and (2) testimony that the examination was even performed at Plaintiff's insistence. (Dkt. No. 150, Attach. 19, at ¶¶ 5-8 [Affid. of Jeffrey Wick]; Dkt. No. 150, Attach. 22, at 80-82 [Plf.'s Rule 50-h Hearing]; Dkt. No. 150, Attach. 2, at 38-43, 97-98, 104 [Plf.'s First Depo. Tr.]; Dkt. No. 8, at 8, 9 [Plf.'s Verified Am. Compl.].) Indeed, to the contrary, it appears the examination may have been required by Sergeant Wick out of an abundance of caution. (Dkt. No. 150, Attach. 19, at ¶¶ 5-8 [Affid. of Jeffrey Wick]; Dkt. No. 8, at 8 [Plf.'s Verified Am. Compl., swearing that "the Justice Center would not accept me until I went to the hospital and was checked out by a doctor and had a rape kit done by doctors"].)[13]

In any event, even if Plaintiff could be found to be partially relying on either of the two above-referenced forms of evidence, the Court would (and does) still find that Plaintiff is relying on his own testimony "almost exclusively." In particular, as discussed above in Part III.A. of this

---

[12]     The Court notes that the material cited to support or dispute a fact on a motion for summary judgment must be able to "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

[13]     As a result, the Court has some trouble understanding how this evidence could have a "tendency to make [the search of his anus] more or less probable than it would be without the evidence" under Fed. R. Evid. 401.

16

Decision and Order, Plaintiff chiefly relies on his testimony that, during the search of his boxer briefs, Defendant Harriman made "contact with" his anus (albeit without "penetration [of]" it) "barehanded[ly]," for between 20 and 40 seconds.

### 2.    Whether Plaintiff's Testimony Is "Contradictory or Incomplete"

With regard to whether Plaintiff's testimony is "contradictory or incomplete," the Court finds that it is. Granted, with regard to the testimony's purported incompleteness, the fact that Plaintiff does not know which of the two Defendants took which actions while searching his boxer briefs is immaterial, because (1) he was facing away from them when the contact occurred (and thus relieved of the duty to identify his alleged assailant),[14] and (2) in any event, Defendants themselves have provided evidence of which Defendant conducted the search of his boxer briefs (i.e., Defendant Harriman). *See, e.g., supra,* Statement of Undisputed Material Fact No. 34 in Part I.C. of this Decision and Order. Moreover, the fact that Plaintiff does not know whether he expressed a verbal objection to the officers searching him, and whether they said anything to him,

---

[14]      "A plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene." *Jeffreys v. Rossi*, 275 F. Supp.2d 463, 474 (S.D.N.Y. 2003); *see, e.g., Gonzalez v. Waterbury Police Dep't*, 199 F. Supp.3d 616, 622 (D. Conn. July 29, 2016) ("[T]estimony from the officers that they were in the immediate vicinity of the arrest, coupled with testimony by the plaintiff that he saw the faces of each of the defendants while he was being punched and kicked, was sufficient for a reasonable jury to conclude that the officers were liable *even though the plaintiff could not identify which officers struck him*.") (emphasis added); *Vesterhalt v. City of New York*, 667 F. Supp. 2d 292, 297-98 (S.D.N.Y. 2009) (denying summary judgment to defendant-officers where plaintiff testified that *she could not identify which officer had assaulted her* but defendant-officers testified they were all present during the assault, and thus "it is possible that all of the officers saw what happened" to her yet "failed to intervene") (emphasis added); *Skorupski v. Cnty. of Suffolk*, 652 F.Supp. 690, 694 (E.D.N.Y.1987) (rejecting defendants' argument that they were entitled to summary judgment because *plaintiff cannot specify which of the officers struck him* and finding that all of the officers were potentially liable because they have an affirmative duty to intervene) (emphasis added).

is similarly immaterial, because no evidence has been adduced (or argument has been made) that Defendants requested permission to run a bare hand over his anus and that Plaintiff consented to that request.

However, the Court must reach a different conclusion regarding the internal contradictions in Plaintiff's testimony. More specifically, the Court finds three such internal contradictions. First, Plaintiff has testified that he could not possibly have reached his hands into the rear of his boxer briefs (and thus give Defendants reason to believe he harbored in them either a weapon or suicide-enabling drugs) because his hands were cuffed behind his back. (Dkt. No. 150, Attach. 22, at 60 [Plf.'s Rule 50-h Hearing, containing the following questions and answers: "Q. At any point were your hands at all near the waistband of your pants? A. No, sir. My hands was cuffed behind my back, sir."]; Dkt. No. 150, Attach. 10, at 7, 9 [Plf.'s Second Depo. Tr., testifying, "I don't understand how I was reaching with my hands cuffed behind my back. . . . How can I search for something when my hands is [sic] cuffed behind my back?"].) There is no indication that Plaintiff could *not* reach his cuffed hands inside the waistband of his boxer briefs; indeed, such a suggestion would appear undermined by Plaintiff's testimony that, when seated, he could reach down to under his knees. (Dkt. No. 150, Attach. 22, at 60 [Plf.'s Rule 50-h Hearing, testifying, "When I sat down, I put my hands under my knees, because they way they had cuffed me was tight"].)[15] Simply stated, Plaintiff's testimony that his hands were cuffed behind his back contradicts his testimony that he could not possibly have reached his

---

[15]    There is also an indication that the discomfort of the cuffs may have caused Plaintiff to move around uneasily before the search, giving Defendants reason to believe he was reaching for something behind his back. (Dkt. No. 150, Attach. 22, at 74 ["So when I was sitting back it was hurting me, so for me to get comfortable, stood up, I put my hands right here."].)

hands into the rear of his boxer briefs (because they were cuffed there).

Second, Plaintiff has testified both that there was digital penetration of his anus and that there was no such penetration.  (*Compare* Dkt. No. 8, at 8, 9 [Plf.'s Verified Am. Compl., swearing that at the hospital he "had a rape kit done by doctors," and "I was took [sic] to the hospital to have the rape kit done"] *and* Dkt. No. 150, Attach. 22, at 80-82 [Plf.'s Rule 50-h Hearing, testifying, "I told her . . . I just want the [rape] kit"][16] *with* Dkt. No. 150, Attach. 2, at 56 [Plf.'s First Depo. Tr.] *and* Dkt. No. 15, Attach. 10, at 17-18 [Plf.'s Second Depo. Tr.].)

Third, and most importantly, Plaintiff has testified that the offending Defendant's bare hand "swiped" Plaintiff's anus only "one time"[17] but essentially lingered there for the following

---

[16]    (*Cf.* Dkt. No. 150, Attach. 15, at ¶ 4.b. [Plf.'s Rule 33 Response to Harriman's Interrogatories, identifying his injuries as including "rape"].) The Court notes that, although Plaintiff's interrogatory responses were not signed by him personally (as they must be under Fed. R. Civ. P. 33[b][1][A] and [b][5]), they were signed by his attorney, who was Plaintiff's agent. As a result, they may be used by Defendants as evidence.  *See* Fed. R. Civ. P. 33(c) ("An answer to an interrogatory may be used to the extent allowed by the Federal Rules of Evidence."); Fed. R. Evid. 801(d)(2)(D) ("A statement that meets the following conditions is not hearsay: . . . The statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed . . . .").

[17]    (Dkt. No. 150, Attach. 10, at 16 [Plf.'s Second Depo. Tr., testifying, "He swiped me one time"].)

durations: "slowly,"[18] 30-40 seconds,[19] 20 seconds,[20] "a few seconds,"[21] long enough to "swipe" a credit card "from the top of the ass crack to the bottom,"[22] and "I don't know" (whether the duration was less than one second, less than 10 seconds, a "consistent motion," or "a slow prolonged motion").[23]   Because of these contradictions in this testimony, the very act of determining whether a jury could reasonably find for Plaintiff based on the testimony necessarily involves a credibility assessment of the testimony.  *See Jeffreys*, 426 F.3d at 554 ("[I]n the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, . . . and thus whether there are any genuine issues of

---

[18]     (Dkt. No. 150, Attach. 22, at 80-82 [Plf.'s Rule 50-h Hearing, testifying, "I wouldn't say insertion, I would say like I said, his fingers slowly rubbed against my rectal area"].)

[19]     (Dkt. No. 150, Attach. 10, at 14-15 [Plf.'s Second Depo. Tr., testifying that the defendant's physical contact with his anus lasted "about, like, 30 seconds, 40 seconds"].)

[20]     (Dkt. No. 150, Attach. 22, at 62, 65-66 [Plf.'s Rule 50-h Hearing, testifying that the "swipe" involved "touching my rectum" or "rectal area," and was done "slowly," taking "20 seconds"].)

[21]     (Dkt. No. 150, Attach. 10, at 16 [Plf.'s Second Depo. Tr., containing following questions and answers: "Q. Mr. West, what you're describing to me sounds like almost a split second or a – no longer than a few seconds. . . . A. Even if it was a few seconds, it's still wrong, though, like. What is you looking for?"].)

[22]     (Dkt. No. 150, Attach. 22, at 62-63 [Plf.'s Rule 50-h Hearing]; *cf.* Dkt. No. 150, Attach. 2, at 70 [Plf.'s First Depo. Tr., testifying, "That's what I meant by credit card swipe me, ran his hand down my cheeks and touched by anal [sic], and that was it"].)

[23]     (Dkt. No. 150, Attach. 10, at 15-16 [Plf.'s Second Depo. Tr., containing the following question and answer: "Q. How long did that swipe take? A. I don't – that, I don't know, I mean. I don't know that. I can't answer that question because I don't know"]; Dkt. No. 150, Attach. 22, at 64 [Plf.'s Rule 50-h Hearing, testifying, "I don't know no time limit"].)

material fact, without making some assessment of the plaintiff's account.") (internal citation and quotation marks omitted).

### 3.   Whether Plaintiff's Testimony Has Been Contradicted by Evidence Produced by the Defense

With regard to whether Plaintiff's testimony has been contradicted by evidence produced by the defense, the Court finds that it has.  (*See, e.g.,* Dkt. No. 150, Attach. 17, at ¶ 15 [Harriman Decl., testifying, "[W]hile I searched Mr. West's waistband with my barehand, I did not make 'skin-to-skin' contact with his buttocks area. At all times my hand remained on the exterior surface of his boxer briefs. I have never, and would never, run my barehand 'skin-to-skin' in contact with a suspect's buttocks area out of concerns for safety and hygiene."]; Dkt. No. 150, Attach. 17, at ¶ 7 [Harkness Decl., testifying, "While I held Mr. West into position, Officer Harriman began to search the *inside of his pants near the waistband* of his boxers"] [emphasis added]; Dkt. No. 150, Attach. 23, at 2 [Def. Harriman's CNYLEADS Narrative Supplement 1, stating, "Knowing that the waistband is a common spot utilized by criminals to conceal weapons or other contraband I then directed my attention to the waistband of West's boxers which he was still wearing. I then ran my right hand along the exterior of the West's waistband to confirm that he was not still concealing anything, this too yielded [sic] negative results"].)

### 4.   Result of Application of *Jeffreys* Exception

As a result, the Court finds that no reasonable jury could find that any such contact with Plaintiff's anus took longer than one or two seconds.  This finding is highly material, because, when part of a search incident to a lawfully executed arrest that poses exigent safety risks, an officer's brief contact with an arrestee's genitalia (when unaccompanied by sexually offensive

words, and when out of public view) is simply not unreasonable under the Fourth Amendment.

*See, e.g., United States v. Levy,* 217 F. Supp.3d 643, 668 (E.D.N.Y. 2016) ("Once defendant was

arrested on probable cause for possessing a firearm, the police required no further justification to

carry out a search of his person incident to arrest. . . The crack cocaine and marijuana found on

defendant's person during this [strip] search [at the police station] are therefore admissible

evidence at trial.") (citing *United States v. Robinson*, 414 U.S. 218, 235 [1973]).[24] The Court

emphasizes that Defendants unquestionably had grounds to believe that Plaintiff was concealing

a weapon or other contraband inside the van based on (1) the four crimes for which he was

arrested, (2) his particular characteristics (as communicated by S.V. and observed by

Defendants), and (3) the circumstances of the arrest (which first involved "buck[ing]" and then

involved declared resistence and physical evasion).  *See Weber v. Dell*, 804 F.2d 796, 802 (2d

Cir. 1986) ("We hold that the Fourth Amendment precludes prison officials from performing

strip/body cavity searches of arrestees charged with misdemeanors or other minor offenses unless

the officials have a reasonable suspicion that the arrestee is concealing weapons or other

contraband based on the crime charged, the particular characteristics of the arrestee, and/or the

_____

[24]      *Cf. Scalpi v. Amorim*, 14-CV-2126, 2018 WL 1606002, at *18-19 (S.D.N.Y. Mar.
29, 2018) (granting defendant's motion for summary judgment on plaintiff's Fourth Amendment
claim, because, during her search of plaintiff's groin area "lasting at most a few seconds,"
defendant had "no more than brief contact with Plaintiff's genital area"); *Garcia v. New York
State Police Investigator Aguiar,* 138 F. Supp. 2d 298, 304 (N.D.N.Y. 2001) (McAvoy, J.)
(granting defendants' motion for summary judgment on plaintiff's Fourth Amendment claim,
because searching "the crotch area, pockets, and the legs," including "cleavage and under each
breast," was reasonable under the Fourth Amendment); *Lamore v. Vermont*, 12-CV-0059, 2013
WL 3560969, at *4 (D. Vt. July 11, 2013) (granting defendants' motion to dismiss plaintiff's
Fourth Amendment claim under Fed. R. Civ. P. 12[b][6], because, even though the search
"involved contact with [the plaintiff's] genitals," it did "not rise to the level of a Fourth
Amendment claim").

circumstances of the arrest.").

Finally, the parties are respectfully advised that, even if the Court were to deny Defendants' second motion for summary judgment, it would find that the parties have narrowed the issues to be tried through their briefing of Defendants' two motions for summary judgment, and that it would be a waste of a jury's time to make them decide facts that have been undisputed by the parties.  As a result, the Court would find that an Order pursuant to Fed. R. Civ. P. 56(g) would be warranted (accepting as undisputed at trial Paragraph Numbers 1-34 and 36-44 above in Part I.C. of this Decision and Order).

**ACCORDINGLY**, it is

**ORDERED** that Defendants' second motion for summary judgment (Dkt. No. 150) is

**GRANTED**.

Date:   May 17, 2022
        Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge

23